# Case No. 13,033.

## SMITH v. The CREOLE et al.

[2 Wall. Jr. 485.] 1

Circuit Court, E. D. Pennsylvania. April. 1853.2

TOWING TUGS—STATUTES WITH PENALTY—PUBLIC PILOT—LIABILITY OF SHIP FOR HIS NEGLIGENCE.

1. Where a larger vessel—a ship—is in tow of a small one—a steam tug—the latter is in law

1 [Reported by John William Wallace, Esq., and here reprinted by permission.]
2 [Reversing Case No. 13,032.]

regarded as the servant of the former; and being thus its agent, and so bound to obey its orders, is not responsible for damage in the proper course of the employment.
[Followed in The Sampson, Case No. 12,-280. Cited in The Belknap, Id. 1,244; The Frank Moffat, Id. 5,060; Albina Ferry Co. v. The Imperial, 38 Fed. 617; The Express, 46 Fed. 863; Homer Ramsdell Transp. Co. v. Compagnie Generale Transatlantique, 63 Fed. 853.]
[Cited in Saulter v. New York & W. S. Co., 88 N. C. 123.]

2. The Pennsylvania pilot act of 29th March, 1803 [4 Smith's Laws (Pa.) p. 67], which "obliges" vessels going out of or coming into the port of Philadelphia to receive a pilot, under a "penalty," and "forfeiture" of half-pilotage, which the act makes a lien upon the ship, and recoverable in the admiralty, is not compulsory, but is optional. The ship need not take a pilot, if it prefers to pay the penalty or forfeiture. Hence, there being a direct privity between the pilot and the ship, the latter is liable in admiralty for damage caused by his acts.
[Followed in Chase v. Crary, Case No. 2,626. Cited in Camp v. The Marcellus, Id. 2,347; The China, 7 Wall. (74 U. S.) 66; Sherlock v. Alling, 93 U. S. 107.]

[Appeal from the district court of the United States for the Eastern district of Pennsylvania.]

An act of assembly of Pennsylvania, passed in 1803, provides for the selection of pilots by the wardens of the port, and for licensing the pilots so selected, after they shall have given bond with surety in a sum not exceeding five hundred dollars, nor less than three hundred, for the faithful performance of their duties. And one section declares that "every vessel (including, of course, foreign vessels), &c., shall be obliged to receive a pilot—in the case of an inward bound vessel. the pilot who shall first offer himself; and in the case of one outward bound, it is enacted. that the master shall make known to the wardens the name of the pilot who is to conduct her (who, by understanding among the pilots, is always the same person who brings her up): and if he neglects to make such report, he shall forfeit and pay the sum of sixty dollars; and if the master shall refuse or neglect to take a pilot, the master, owner, or consignee of such vessel shall forfeit and pay to the wardens a sum equal to the half-pilotage of such vessel, to the use of the society for the relief of distressed and decayed pilots, their widows and children." By a supplement to this act, the "penalties" above recited are declared to be liens upon the vessel, and process, in the nature of admiralty process, is directed to issue from the state courts to enforce their payment. See Act March 29, 1803, §§ 17, 18, 29, and Act Feb. 24, 1820 [7 Laws Pa. 40]. The act is a long and circumstantial one of thirty-seven sections. and under its provisions the port of Philadelphia has long been almost exclusively governed. It makes in short a complete and authoratative code of port warden law. Its title is "To establish a board of wardens for the port of Philadelphia, and for the regula-

tion of pilots and pilotage, and for other purposes therein mentioned." It directs certain penalties, which it prescribes to be paid to the "Society for the Relief of Distressed and Decayed Pilots, their Widows and Children." But it does not establish or regulate or in any other way refer to that society, which was one previously in existence. The Pennsylvania act, unlike one or more of the English pilot acts hereafter mentioned, which, in effect, though not in terms, oblige or require masters to take pilots aboard, does not contain a clause exempting masters or owners for damage done through the neglect, default, incompetency, or incapacity of the pilot. With this act in force, the Creole, a British ship, bound out and in charge of a licensed pilot, left one of the Philadelphia wharves, under tow of the steam tug Sampson, a small steamer of sixty horse power: and in a very culpable manner, owing solely to the negligence of this pilot, ran foul of the John Smith, which was quietly moored in a proper place on the opposite shore. The ship and tug were, of course, both under the pilot's command, and there was no pretence that he was interfered with or disobeyed. On a libel filed against both the steam tug and the ship, the district court, from which the case came here by appeal, was of opinion that they were both exempted, from the fact that both were in charge of a licensed pilot, whom the court considered had been compulsorily taken aboard. [Case No. 13,-032.]

In order to understand fully the arguments of court and counsel, and the cases which they cited on appeal, it is necessary to refer to certain other pilot laws, both American and English. The Pennsylvania act, on which this question arose, was passed, as has been said, in 1803. Congress, as early as August 7, 1789, had enacted (section 4, Act Aug. 7, 1789 [1 Stat. 54]) "that all pilots &c., shall continue to be regulated in conformity with the existing laws of the states respectively wherein such pilots may be, or with such laws as the states may respectively hereafter enact for the purpose, until further legislative provision shall be made by congress." New Jersey, on February 8, 1837 (Acts 1837, p. 110), passed an act, which, though intended to establish and regulate pilots for certain ports not on the Delaware, provides for the case of a master of any vessel coming into any of the waters of New Jersey, who shall refuse to take on board a pilot, &c. And the state of Delaware has also a pilot law and system. These three states, it is known, are all bounded by Delaware river and bay. And an act of congress, passed March 2, 1837 [5 Stat. 153], enacts, that it shall be lawful for the master of any vessel "coming into or going out of any port situate upon waters which are the boundary between two states, to employ any pilot duly licensed or authorized by the laws of either of the states," &c.

The first English pilot act of importance appears to have been passed in 1716. 3 Geo. I. c. 13 (5 Ruffh. St. 88; Id. 679; 6 Ruffh. St. 481). It recites the antiquity, usefulness, and skill of the fellowship known as the "Pilots of Trinity House," and that persons not belonging to that fellowship, and incompetent, had lately interfered with their business, and lost or endangered many ships. It therefore forbids any person not belonging to that house to pilot ships under penalty of £10; saving, however, to all masters, &c., residing at Dover, Deal, or in the Isle of Thanet, the right to pilot their own vessels from any of those places; and it gives, always, to every master, "the liberty to make choice of such pilot of the said society or fellowship as he shall think fit." The act declares that the number of pilots in the fellowship shall never be less than 120. It nowhere, in terms, "requires" or "obliges" the master to take a pilot; nor does it affix any forfeiture or "penalty" for his not doing so, except so far as he may come within the designation of any person not belonging to that house, and may not come within the exception of a master residing at Dover, Deal, or in the Isle of Thanet. And it nowhere, in terms, exempts an owner or master for damage done through the neglect, default, incompetency, or incapacity of a pilot.

Passing by a subsequent act, that of 48 Geo. III. (A. D. 1808; 21 Ruffh. St. 479, c. 104), an important act in the history of English pilotage, but one not important in the statement of the case before us, we come to the act of 52 Geo. III., passed in 1812 (22 Ruffh. St. 714, c. 39). It recites (section 1), among other things, the wrecking of vessels and the loss of lives and property, from the ignorance and misconduct of incompetent persons attempting to pilot; and recites further the antiquity and usefulness of the pilot societies of Trinity House; and then provides (section 2) for the appointment of a body of fit pilots, in connection with the Trinity House, their rates of pilotage and contributions to be made by themselves, to support their house. It enacts (section 6) that no person but a regular pilot shall take charge of vessels, under a money "penalty," which the act prescribes; that (section 10) not less than eighteen pilots, in succession, without intermission or any unnecessary delay, shall by day and night constantly ply at sea, or be afloat to take charge of vessels, &c., whose approach is to be made known to them by signals, for the establishment of which the act provides; upon the making of which signals the pilots are forthwith to go off in time to fall in with such ships and vessels, "on pain of forfeiting, for the first offence, £20, for the second," &c. And the masters of ships (section 11) coming towards land "shall display and keep flying the usual signal for a pilot to come on board;" and if a pilot is within hail or approaching, and the master does not facilitate his getting on

board, and give the charge of piloting his ship or vessel to such pilot, he "shall forfeit and pay double the amount" of the pilotage charge. It then enacts (section 30) that no owner or master of any ship shall be answerable for any loss or damage, nor be prevented from recovering upon his insurance, for a loss occasioned by the neglect, default, incompetency, or incapacity of any regular pilot. It saves (section 31) the right of any person to proceed by civil action against pilots or other persons; and provides (section 73) that nothing in the act shall "affect or impair the jurisdiction of the court of admiralty."

Finally came a pilot act, passed in 1825, 6 Geo. IV., quite a long and particular act, but containing, so far as we need refer to it, the same provisions as the act of 52 Geo. III., already quoted. No one of these last acts, in terms, either "requires" or "obliges" the master to take a pilot. The three last acts are sometimes severally called the "General Pilot Act." Relating, however, chiefly to vessels sailing on certain waters in the south of England, and not so obviously including vessels sailing on other rivers, the term is not clearly proper; and the extent of their application has been a matter of some diversity of opinion. These acts do not, in their terms, either embrace or exclude foreign vessels, but have generally been considered as not applying to them. Independently of these so called general pilot acts, are certain local pilot acts, proper to be mentioned.

The Liverpool pilot act, 37 Geo. III. See 3 Price, 318. That act places in the hands of a committee the power over pilots for the port of Liverpool; and after providing for their rates of remuneration for piloting ships into and out of that port, enacts, in one clause, "that the master of any vessel outward bound, who shall proceed to sea and shall refuse to take on board and employ a pilot, shall pay the full pilotage. A subsequent clause of the same act provides, "that if the owner, master, or commander shall require the attendance of a licensed pilot on board any ship or vessel, during her riding at anchor, such pilot shall attend such ship or vessel, and be paid for every day he shall attend, five shillings and no more." No clause of compulsion of any kind to have a pilot, nor any imposition of "penalty," is contained in this act. This act, like the Pennsylvania act, and unlike the "general pilot act," contains no clause of exemption to master and owners for damage occasioned by the negligence, &c., of the pilot on board; nor exemption from defence by insurers, from the mere want of a pilot. The Newcastle Pilot Act, section 41 (Geo. III. c. 86, § 6; 1 W. Rob. Adm. 108), very much in this respect, resembling the Pennsylvania statute, and enacting that the owners or masters of any foreign ships, &c., coming into or departing from the said port of Newcastle, &c., "shall and they are hereby obliged and required" to receive and employ a pilot licensed under the act; "and in case of their neglect or refusal to receive and employ such pilots as aforesaid, they shall severally, nevertheless, answer and pay to the said master, pilots and seamen, the aforesaid pilotage duties." This act, like the Pennsylvania and Liverpool acts in this respect, and unlike the general pilot acts of 52 Geo. III., and 6 Geo. IV., contains in terms no clause of exemption of liability to the master and owners, for damage occasioned by the negligence, &c., of the pilot on board.

G. M. Wharton and R. R. Smith, for libellant, Smith.

R. P. Kane, for the Creole.

Mr. Sanderson, for the Sampson.

The two questions in the case being: (1) Whether, under any view, the steam tug being so small a vessel, was liable? (2) Whether, having taken a regularly licensed pilot aboard, excused the ship; the fault, confessedly, having been the pilot's alone.

For the towing-tug, the Sampson:

It was said, that being so small a vessel—only about sixty-five horse power—and towing a large foreign ship, she was a mere servant of the ship, and that the case was quite different from the case of a large steamer towing small boats; in which last case, the smaller boat, which was often hitched on with several others, was necessarily in the custody and under the control of the large boat, who, with few or no orders to any of them, dragged them just where she pleased.

And this view, though not admitted by the libellant, or by the owners of the ship, was not so strongly contested. The argument was principally on the second point: on which it was argued,

For the libellant:

I. The language of this act we concede is strong. But the act itself has never been considered as obligatory. The reason probably is, that the right of state legislatures to act at all on this subject, may be questioned. The subject is intimately connected with the duty "to regulate commerce with foreign nations and among the several states." And this duty the constitution of the United States gives to congress. Whether to congress exclusively, or not, is a matter which was long a subject of dispute, and is but just now settled. Cooley v. Board of Wardens, 12 How. [53 U. S.] 299. New Jersey, which bounds the Delaware bay and river on the east, has a pilot law; so has the state of Delaware. Since 1837 the United States have a pilot law. "That the subject of pilotage in bays and rivers bounded by two states, is within the constitutional power of the federal government, cannot," says Judge Rogers (7 Pa. St. 311), "I think, admit of doubt." Undoubtedly the act of congress will excuse a violation, in its favour, of any state act.

II. On general principles of law, the employment of a pilot under the Pennsylvania

act, was not obligatory. "In relation to those laws," says Blackstone (1 Comm. Introduction, p. 58, § 2), "which enjoin only positive duties, and forbid such things as are not mala in se, but mala prohibita, merely without any intermixture of moral guilt, annexing a penalty to non-compliance, here, I apprehend, conscience is no further concerned than by directing a submission to the penalty, in case of our breach of those laws. * * * In these cases the alternative is offered to every man; 'Either abstain from this, or submit to such a penalty;' and his conscience is clear, whichever side of the alternative he thinks proper to adopt. * * * These prohibitory laws do not make the transgression a moral offence or sin: the only obligation, in conscience, is to submit to the penalty, if levied." He quotes Bishop Sanderson, whose language (De Consientiæ Obligatione, Præl, viii., §§ 17, 24) is "Lex pure pœnalis obligat tantum ad pœnam, non item ad culpam."

III. This question is hardly open; for it is a question on a state enactment, judicially explained by the highest court of the state itself. Bussy v. Donaldson, 4 Dall. [4 U. S.] 206, was decided by the supreme court of Pennsylvania in 1800, upon a pilot act similar in terms to the present one. Chief Justice Shippen then said: "The legislative regulations were not intended to alter, or obliterate the principles of law, by which the owner of a vessel was previously responsible for the conduct of a pilot; but to secure, in favour of every person (strangers as well as residents) trading to our port, a class of experienced, skilful and honest mariners, to navigate their vessels safe up the bay and river Delaware. The mere right of choice, indeed, is one, but not the only, reason, why the law, in general, makes the master liable for the acts of his servant; and, in many cases, where the responsibility is allowed to exist, the servant may not, in fact, be the choice of the master. For instance, if the captain of a merchant vessel dies on the voyage, the mate becomes captain; and the owner is liable for his acts, though the owner did not hire him, originally, nor expressly choose him to succeed the captain. The reason is plain: he is in the actual service of the owner, placed there, as it were, by the act of God. And so, in the case under consideration, the pilot was in the actual service of the owner of the ship, though placed in that service by the provident act of the legislature. The general rule of law, then, entitles the plaintiff to recover; and we have heard of no authority, we can recollect none, that distinguishes the case of a pilot, from those numerous cases on which the general rule is founded." This construction of the pilot law, after an acquiescence in it for forty-seven years, was again judicially established by the same court in Flanigen v. Washington Ins. Co., 7 Pa. St. 306. "The act, it is true," say the court, "in its terms seems to justify the position assumed; * * * but in the construction of

this act, we must avoid laying too much stress on particular expressions. * * * It is very evident from a glance at the act, connected with the knowledge we have of its history and subsequent legislation, there has been a conflict of interests between the owners of ships and vessels employed in the foreign and coasting trade, and particularly the latter, on this subject; one contending for, and the other against, the compulsory employment of pilots in the navigation of these waters. This difference has resulted in a compromise. The legislature have wisely decided not to compel the owners to employ one, but have permitted them, if they please, to compound, by paying half pilotage, for the benevolent and beneficial purpose of relieving distressed and decayed pilots, their widows and children. The act sets out an inducement to avail themselves of their services, but does not compel them to do so. This construction of the act is reasonable and just. The legislature had two objects in view; the encouragement of that meritorious and patriotic class of men, by employment in their profession, and when that cannot be accomplished, by providing a fund, at the expense of the owners, for the support of themselves, their widows and families, when, either from age or disease, they may need assistance. It is just, as to the owners, whose interest it is to encourage a race of men surrounded by peril and hardship, and who contribute so much to the security of life and property, in the intricate navigation of our waters. But while this object is kept steadily in view, care has been taken not to throw too great a burden on the owners, which would certainly be the result of compelling them to employ a pilot, and of course pay full pilotage, even when the master of the vessel may have equal, if not greater skill, than those whom they may be obliged to employ; many of them being selected because of their intimate knowledge of the navigation."

IV. It is hardly necessary to refer to English decisions on this point, but that of The Neptune the Second, in the English admiralty (1 Dod. 467), is very strong. It was in November, 1814, two years and more after the act of 52 Geo. III., containing the clause of exemption, but saving the rights of the admiralty, had passed. Sir William Scott says, "If the position could be maintained, that the mere fact of having a pilot on board, and acting in obedience to his directions, would discharge the owners from responsibility, I am of opinion that they would stand excused in the present case; for I think it is sufficiently established in proof, that the master acted throughout in conformity to the directions of the pilot. But this, I conceive, is not the true rule of law. The parties who suffer are entitled to have their remedy against the vessel that occasioned the damage, and are not under the necessity of looking to the pilot, from whom redress is not always to be had, for

compensation. The owners are responsible to the injured party for the acts of the pilot, and they must be left to recover the amount, as well as they can, against him. It cannot be maintained that the circumstances of having a pilot on board, and acting in conformity to his direction, can operate as a discharge of the responsibility of the owners." The case of The Transit, not reported, but referred to as decided by Sir John Nicholl (1 W. Rob. Adm. 50), seems to have been decided in the same way. And while Dr. Lushington, in cases which will be cited on the other side, has said that Sir William Scott did not know of the passage of the act of 52 Geo. III., this would seem to be less probable than that, considering the jurisdiction of the admiralty undisturbed by the act, he meant to decide that, notwithstanding the master was obliged, so far as penalty obliged him, to take a pilot; and admitting that the clause of exemption would release him and the owners in a common law court, yet, as the act declared that nothing in it should affect or impair the jurisdiction of his court, the ship was still liable in his court. In other words, he meant to decide that it was the clause of express exemption, and not the mere penalty on such compulsory taking of a pilot, as a penalty made, which exonerated the vessel. This view of the act, in its effect on proceedings against the ship, is also taken by Sir J. Nicholl, in The Girolamo, 3 Hagg. Adm. 180. "The next clause indeed enacts," says this learned judge, "that nothing in this act is to deprive persons of any remedy or remedies upon any contract of insurance, or of any other remedy whatsoever, which they might have had if this act had not been passed, by reason or on account of the neglect, default, incompetency or incapacity of any pilot duly acting in charge of any ship:" and then comes the section, expressly saving the jurisdiction of the court of admiralty. If, then, all the former remedies are to remain, and if the jurisdiction of the court of admiralty is to be unimpaired, the remedy against the ship still exists, and masters and owners are only exonerated from personal responsibility. Before any of these acts passed, there can be no doubt that a pilot being on board, would not have exempted the owner from responsibility; what is then meant by "any other remedy or remedies whatsoever?" The remedy reserved, and the jurisdiction reserved, appear to me to mean, by the most just and fair construction, the remedy, in rem, in this court, according to the existing rule of the maritime law of nations. Now our act contains no clause of exemption; while its obligations to take a pilot on board, are really not so compulsory as those of the act of 52 Geo. III., for this last contains a penalty of double pilotage, whereas ours contains a penalty of but half pilotage. And without considering what might be, or what have been the decisions of our state common law courts, we have the decisions of Sir William Scott and Sir John Nicholl, in The Neptune the Second and in the Girolamo, sustaining the liability by remedy, so far as the vessel itself extends, in this, a court of admiralty. Fletcher v. Braddick, 2 Bos. & P. (N. R.) 182, though not a case arising on the pilot acts, seems to declare a principle such as we seek to establish. There the defendants being owners of a ship, had chartered her—ship, master, mates and men—to the government, who put on board a commander in the navy and a king's pilot; and while under the orders of these, damage was done by a careless collision. But notwithstanding that charter party gave complete control of the ship to the government for the time being, and both master, mates and men were stipulated to be under the control of government, the court held that with regard to third persons, the ship was to be considered as the ship of the owners; and that they were liable for the damage.

For the ship, the Creole:

The question is, whether it is the law or the ship owner which put the pilot on board?

I. The case is to be decided on the language of the act; and that language is to be construed by the rules of law—not by the understanding of ship owners. The state of Pennsylvania, governing by a system meant to comprehend the entire subject of navigation in the Delaware river and bay, "obliges" every vessel to receive a pilot; and affixes "a penalty," which it makes a lien, for the omission to do so, and gives to pilots specific liens and remedies to enforce them. The right of the state to pass this law, is settled conclusively. Cooley v. Board of Wardens, 12 How. [53 U. S.] 300. It was never a matter of any practical doubt; for congress, as early as August 7th, 1789, acknowledged and assisted the states in regulating this matter.

II. The subjection of the navigation to a public control, is a most important matter of state. The law meant—as public policy and necessity requires that it should mean—to prevent accidents from collision, in our long and intricate river and bay, by a general preventive police. The law commands. The party "shall be obliged." A penalty is annexed, to be sure, and the argument is that the act thus provides an alternative. A statute may, indeed, be so worded, as to allow the party an option to do what it aims at, or to pay a penalty; to pay a tax, e. g., at a certain day, or the tax and 10 per cent. at a day after. But this act is not so worded. It creates a duty, and punishes for the violation of it. Penalty is that which is rendered for wrong, and is not commutation or forced equivalent for acknowledged right. It implies, at least, in its general interpretation, the commission of some illegal act. The argument of the other side, "would prove every trespass to be matter of right, subject only to just responsibility." See the argument put

with great force by Mr. Webster in reply to Lord Ashburton (Works, vol. 6, p. 337). A man might legally forge, rob or murder, if he would only surrender himself to be imprisoned or hanged. The doctrine mooted by Blackstone (1 Comm. Introduction, p. 58, § 2) is not supported by the ethical writer, Bishop Sanderson, whom he quotes only in part. It is strongly and rightly dissented from by his able commentator, the present Mr. Justice Coleridge, of the C. B. He never, himself, meant to apply it, except to cases where the law is "simply and purely penal; where the thing forbidden or enjoined is wholly a matter of indifference," and where it can involve in it no degree of "public mischief or private injury." Id. "Perhaps," says Mr. Coleridge, "we shall find presently, when we consider the principle of obedience to the laws, that no matter can be purely indifferent, upon which the law acts by way of prohibition or command. But in the mean time the opinion seems a little inconsistent with other parts of the text, because it admits that a part of the law at least, (the penal part,) has a binding force on the conscience. To escape this, it is said that the law is to be understood as offering an alternative, and that the lawgiver did not intend the penalty as a punishment, but as a compensation. This is not very intelligible, when reduced to practice; compensation for what, and to whom?— some injury to some person or body is assumed in the very notion of compensation; and, in the case before us, that injury must flow from the breach of the law; so that the hypothesis is, that the legislature, seeing that a certain thing cannot be done without injury, deliberately agrees that it shall be done by any one, who will pay so much money for doing it; and it clothes this agreement and permission in the form of a direct prohibition. But even this explanation will not serve in the common case, in which, on default or inability of payment, the punishment is whipping or imprisonment; a fine paid to the king, the representative of the injured community, may be conceived to be compensation. But in the case now supposed, it must be said, that the legislature allows any man to do a given act, by the hypothesis injurious to the community, who will compensate it for that injury, by submitting quietly to be whipped. Penalty, of whatever kind, is only another name for punishment; and punishment, as the author himself tells us (in volume 4, p. 11), is not imposed for the sake of atonement or expiation, but as a precaution against future offences. The amount of the penalty may indicate the importance which the legislature attaches to the crime, and so indirectly the public inconvenience of the breach of the law; but it never can be looked upon as calculated to heal the wound occasioned by the breach. Nor have the wisdom or importance of the law any thing to do with the principle of our obedience to it; the true principle of that is the authority of the lawgiver, which must be the same, whatever be the law. If we are convinced that the authority is sufficient, we ought to obey equally in great and small; nothing will discharge us but the opposition of a superior authority, which, in truth, renders the inferior insufficient. The same principle, upon which a breach of one commandment is declared to make a man guilty of the whole ten, applies to this case, and the more closely, the more trivial the matter may seem; for the smaller the inducement is upon which we break the commandment, the greater is the contempt of the authority. Common sense and experience approve this reasoning, by showing that nothing is in fact indifferent when the law has once prohibited it. The breach of any one law must be inconvenient, either by way of example to other persons, or as diminishing the habit of respect for other laws, in ourselves. The laws of a country form an entire connected body, and though "he that takes a little piece of iron from an iron forge, may do no great harm; yet if he takes it from a lock or a chain, he disorders the whole contexture." The amount or character of the penalty can make no difference in the legal or moral obligation to obey the law. If the penalty had been imprisonment for a twelve month, would it be argued that the party might rightly disobey the law, if, on landing, he would go, without compulsion, to gaol?

III. The two cases cited in the state courts, are not obligatory here. Admitting that on a statute strictly local—a statute, e. g., relating to real estate, the decisions of the state courts settle the construction for this court—the case of such a state statute as this is very different. The act is essentially extra-territorial in its sphere of action. It is intimately connected with foreign subjects: so much connected with the "regulation of commerce" between foreign nations, as to have caused great doubt whether the state had a right to pass such acts at all. It has been decided that they have. But it is indispensable that the construction of them remain to be settled by the federal courts, in those cases where questions arise in those courts upon them. Independent of this, Bussy v. Donaldson hardly has the weight of a well-considered judgment. Chief Justice Shippen expressly states, that it was a point of law "equally interesting for its novelty and its importance, suddenly started;" and one of a sort on which it was not "agreeable to deliver an opinion," as he did. Flanigen v. Washington Ins. Co. was a sharp attempt by demurrer, to deny a statutory seaworthiness: no proof being given, of course, of the want of any sea-worthiness, in fact.

IV. In reviewing the English cases, it is necessary to advert to the dates of their decision, and to observe upon what acts they were decided. Bowcher v. Noidstrom, 1 Taunt. 568, was in 1812, and under the act of 3 Geo. I. That was a suit in trespass against the master of a Swedish ship, for damage done to another vessel, while the

Swedish ship was in charge of a pilot, who "gave directions to one of the crew" to do an act which the court considered improper to have been done, and which was the cause of the damage. The master now sued was on board at the time; but he was asleep in his bed and gave no orders throughout the whole transaction. Mansfield, C. J., who tried the case at nisi prius, being "of opinion that, although there was a pilot on board, the pilot does not represent the ship, and that the master was still answerable for every trespass," the jury found for the plaintiff. But on a rule nisi, in banc, to set aside the verdict, and have a new trial, "the court held that, as it did not appear that the captain had done any act in this case, the rule to enter a nonsuit must be made absolute." Here then under a statute much less positive than our Pennsylvania statute, in requiring the master to take a pilot—a statute where the master had the liberty to make choice among 125 different pilots, which one he would have, and where there was no clause exempting owners—the master was held not liable. Certainly, the ground of this decision must have been that the vessel was properly in the hands of a legally appointed pilot, who, while on board, was the proper and exclusive person to give orders. The principle of the decision relieves the owner just as much as it can the master. In the well considered case of Attorney General v. Case, 3 Price, 302, in the exchequer, in 1816, the owners of a vessel which damaged another ship lying at anchor in the river Mersey, and not proceeding on her voyage, by mismanagement of the helm while a pilot was aboard, was held liable. But why? "Because," says the syllabus, "the Liverpool local pilot act is not compulsory or penal on the captain to take a pilot on board whilst lying at anchor, but merely subjects him to the pilot's regulated allowance on refusal." It will be seen by reference to the peculiar terms of that act, how very different it is from ours. The counsel in the case just cited, who sought to charge the vessel, expressly distinguish the Liverpool act from the acts of Geo. III., &c. "The Liverpool act," they say, "is not imperative; * * * there is no penalty in that act * * * as there is in the 52 Geo. III. So that, if the master pleases, he may decline the services of a pilot on paying him his regular allowance; and the true reason of the indemnifying clause in the 52 Geo. III., is that the taking a pilot on board is compulsory." Chief Baron Thomson, in giving the judgment of the court, which adopting this view, held the vessel liable for the damage, distinguishes the Liverpool pilot act from the other, sometimes though improperly called the general pilot act; distinguishing them, not by adverting to the express clause of exemption in these latter, but by the fact that "a penalty" is annexed to the omission to take a pilot. His language is (3 Price, 321), "There is therefore no obligation imposed by the 37

Geo. III. (i. e. the Liverpool act), upon the master, to take any pilot whatever on board his vessel before she proceeds on her voyage; for the consequence of his refusing to take a pilot on board, on other occasions, is only a liability to pay the same wages as if he had taken such pilot on board. Now, if he was proceeding to sea, having taken such pilot on board, and if while the ship was duly and properly under the management of that pilot, an accident had happened, it might have been a fair question, whether the owner would then have been answerable; though there have been cases which show that, though a pilot may be on board, the master is in some instances deemed responsible, notwithstanding. But, I repeat, there is no such penal provision in this act of the Liverpool pilotage. By the thirty-fourth section of that act, indeed, it is provided, 'that if the owner, master, or commander shall require the attendance of a licensed pilot on board any ship or vessel during her riding at anchor, &c., such pilot shall attend such ship or vessel, and be paid for every day he shall so attend, five shillings and no more.' So that there is nothing here compulsory upon the master or owner to take on board a pilot while he is riding at anchor in this river Mersey. It is optional in him whether he will do it or not; but if he chooses to do so, he is to pay the pilot at the rate of five shillings for every day he shall attend, and no more. His obligation to take a pilot is only on his proceeding to sea, and refusing to take on board a pilot so licensed. There is no penalty for not taking on board a pilot while lying in the river Mersey; but he is enabled, if he thinks fit (and not otherwise), to command the services of a pilot while so lying at anchor, paying for him at the rate here specified; and it is for that accommodation that he is to pay the five shillings, if he refuses to take the pilot on board. * * * He was not compellable, at that time, in any way, either under the penalty of double the wages, or of paying even the single wages, to have any pilot on board. It was his own act to have him; and it can be only in the case of such an officer having been forced upon them and without his own election, that the responsibility of the owner can possibly be discharged." But the case of The Maria, 1 W. Rob. Adm. 95, which arose on the Newcastle pilot act, and was most carefully considered by Dr. Lushington, is in point. There can be no doubt that if the Pennsylvania statute is compulsory, the owners are discharged. And the case of The Maria settles what language creates compulsion. The Newcastle act, unlike the general pilot act of 52 Geo. III., &c., contained no clause of express exemption; but it "obliged and required" masters to receive, take on board, and employ a pilot. Neither did it prescribe any "penalty" eo nomine, but enacted simply that, "in case of their neglect or refusal to receive and employ such pilots as aforesaid, they shall severally neverthe-

less answer and pay to the said master pilots the pilotage duties." It was in truth an act less strong than our state act. A collision having occurred while a pilot was aboard, the question in admiralty was, whether that fact discharged the owners. And what says the court? "Does the section in question impose any compulsory duty and necessity upon the owner or master to take a pilot on board? I am not clearly of opinion that the section referred to is compulsory. If it had been enacted simply that a pilot should be taken, without providing that, in case a pilot was not taken, the pilotage should be paid, the master would clearly have been liable to be indicted for a misdemeanor. * * * Look at the words of the act, 'obliged' and 'required,' they are compulsory per se. But is not the making the neglect to take a pilot punishable with payment of the pilotage also, a compulsion upon the owners. Suppose the statute had mentioned ten times the amount of pilotage. It would only be in the degree of compulsion, but not in the compulsion itself. * * * The opinion I have thus formed in this case is founded on the general principles of reason and justice; that no one should be chargeable with the acts of another who is not an agent of his own election and choice. And I further think, that it would be contrary to all sense of equity, to say to the owners of a foreign vessel, 'You shall take a pilot of our selection, of our appointment; be he drunk or sober, negligent or careful, skilful or ignorant, you shall be responsible for his conduct unless you choose to submit to the penalty, and penalty it is, of paying the pilotage for nothing.'" So, too, in Carruthers v. Sydebotham, 4 Maule & S. 77, a suit on an insurance, though the court of king's bench (differing herein from the court of exchequer, in Attorney General v. Case, 3 Price, 302), held that the general pilot act did apply to the port of Liverpool, and therefore in the decision which they gave against the underwriter could have invoked the clause of express prohibition of a defence by the underwriter, when the loss arose from the pilot's act, yet the court does not do so; but puts it on the fact that the terms of the general pilot act—terms less strong than in ours — are compulsory. Lord Ellenborough says: "If the master cannot navigate without a pilot, except under a penalty, is he not under the compulsion of the law to take a pilot? And if so, is it just that he should be answerable for the misconduct of a person whose appointment the provisions of the law have taken out of his hands? . . . . . The consequence is, that there is no privity between them." Le Blanc, J., says: "It appears that the master was compellable by law to take on board a pilot;" and he afterwards refers to and relies on the express clause, "independently of the general principle." Bayley, J., says: "This being a case where the master of the ship was bound at his peril to take a pilot on board, he cannot

be identified with the pilot," &c. And see McIntosh v. Slade, 6 Barn. & C. 657, 665. The position we contend for is embraced in a principle of law stronger than it is necessary for us to contend for—a principle of law generally. Thus in Milligan v. Wedge, 12 Adol. & E. 737, a butcher who had bought a bullock, employed a licensed drover to drive it home; none but licensed drovers being allowed to drive bullocks. The drover employed a boy to drive the animal, which did damage through the boy's careless driving. Denman, C. J., says: "The party sued has not done the act complained of, but has employed another, who is recognized by the law as exercising a distinct calling. The butcher was not bound to drive the beast; he might not know how to drive it. He employs a drover, who employs a servant, who does the mischief. The drover therefore is liable, and not the owner of the beast. * * * So as to decisions upon the pilot acts: when it is not necessary to employ a pilot, the master who has voluntarily employed one, is liable for his act." So Williams, J.. "Where the person who does the injury exercises an independent employment, the party employing him is clearly not liable." And Coleridge, J., "I make no distinction between the drover and the boy. Suppose the drover to have committed the injury himself. The thing done is the driving. The owner makes a contract with the drover that he shall drive the beast, and leaves it under his charge, and then the drover does the act. The relation, therefore, of master and servant does not exist between them." Now there is no English case which establishes a doctrine contrary to the one we seek to establish. That of The Neptune the Second, 1 Dod. 467, cited on the other side, in which Sir W. Scott uses language broad enough to comprehend contrary doctrine, was the case of a foreign ship. to which none of the English pilot laws apply. as was decided by Sir J. Nicholl in The Girolamo, 3 Hagg. Adm. 169. The report contains no statement of the case nor any argument of counsel, while Sir W. Scott's opinion proceeds on the supposition that the reporter had done his duty, and given both. The grounds of his opinion—the antecedents upon which it was given—not appearing, an eminent judge (Dr. Lushington) has been forced to suppose that Sir W. Scott did not know of the act of 53 Geo. III.. passed a year before. Certainly it is impossible to believe that with an express exemption clause, he still held parties subject to that act, liable. But it is almost impossible to believe that he did not know every thing important to any decision of his. The decision is perfectly explained by supposing that he was speaking only as to the case before him, the case of a foreign vessel: and that he gives results only of his argument without any exhibition of the process of mind. which in the case of The Girolamo a foreign ship also, brought his successor, Sir J. Nicholl, to a similar conclusion.

3 Hagg. Adm. 169. After the case of The Neptune the Second, comes, in 1834, that of The Girolamo, just mentioned, and also cited on the other side, in which the presence of a pilot was also held no discharge. This case, in truth, required no decision upon law. The Girolamo left the London docks with a pilot aboard, and went down the Thames as far as Blackwall, about which place a thick fog came on. The master, instead of interposing, as supreme over pilot and all on board, and stopping the vessel, "did not in the least interfere." The vessel went on, and when she got so much further down the river as to be below Woolwich, she ran afoul of another vessel and injured her. Sir J. Nicholl says in this part of the case (page 176): "But again, did the accident arise from the 'neglect, default, incompetency, or incapacity' of the pilot? or was the master in pari delicto? It occurred from the vessel going on in the fog, not from any act of bad steerage, want of knowledge of shoals, or any incapacity as pilot: but from proceeding at all. * * * Had he (the master) not a right to resume his authority? Did he not owe it to his owners and to other persons, whose property might be damaged by a collision, to insist on bringing the vessel up? If he was in as much haste to get out of port, as the pilot was to finish his job, are they not in pari delicto? Was not the master in duty bound, at least, to remonstrate with the pilot, and to represent the danger of proceeding? * * * Is the master, or are the owners relieved from all sorts of responsibility, however gross and manifest the misconduct of the pilot may be, whilst the master remains a passive looker-on, without taking any step to guard against damage?" The court, however, put the case on other ground, st., that of the foreign character of the ship, which, as a foreign ship, was not meant to be included in the British act: and declares, that as by the laws of Austria, a British vessel would be held liable in similar circumstances, no law of national reciprocity could control the court in applying the general rule of law that the owners are responsible. Fletcher v. Braddick, 2 Bos. & P. (N. R.) 182, cited on the other side, has confessedly nothing to do with the pilot acts; nor with the principle of exemption which they give. There the defendants had chartered their ship to the government. The commander of the navy, by whom the bad orders were given, was placed in the situation and power to give them, by the voluntary act of the defendants: and so having voluntarily enabled others to do the injury, they could not themselves plead exemption.

GRIER, Circuit Justice. When canal boats, or other like vessels, are towed by steamboats, it is usually under a contract, which puts the towed vessel wholly under the direction and control of the officers of the steamboat. In such cases the steamboat would be liable for any collision occasioned by the negligence or want of skill of her officers. But when the steam power has been hired to tow larger vessels in or out of port, the contract is different, and creates a different state of responsibility. The tow-boat in such cases is the servant of the ship, and in the exercise of its physical power is bound to obey the orders of the master or pilot who has command or control of the ship. If the tow-boat obeys the directions of the pilot or master of the vessel, he is responsible for the consequences. If the ship is brought into collision with another vessel, by the unskilfulness or disobedience of orders of the officers or hands on the tow-boat, its owners are liable to the owners of the vessel or person who employed them, but not to, third parties. Their recourse is to the master and not the servant, unless in case of malicious or wilful injury. It is only necessary to refer to The Duke of Sussex, 1 W. Rob. Adm. 270, The Duke of Manchester, 2 W. Rob. Adm. 478, and The Gypsey King, Id. 537.

Second. The position assumed in behalf of the ship, and by which it is sought to cast the responsibility on the immediate cause of it—the pilot—raises a question of vast importance in its bearing on our bay and river navigation. In most, if not all the ports of the United States, the laws for licensing and regulating pilots, are enacted by the different states in which the ports are situated. And however variant they may be in their details, they generally require a vessel entering or leaving a port, to employ a licensed pilot. The persons licensed are seldom of sufficient property to respond in damages for their acts of negligence, nor are they required to give security to a sufficient amount to meet such responsibility. If the colliding vessel be discharged from liability, while under the direction of a licensed pilot, and recourse for the injury can be had against the pilot alone, the injured party will, in most cases, be wholly without remedy.

It is a violent presumption against the validity of this defence, that in the numerous cases of collision daily occurring in the United States, in many or most of which, no doubt, the vessels have been under the control of licensed pilots, the owners have not endeavoured to avail themselves of it. Nor has the learned counsel for the respondent, with all his research, brought to my notice a single case in the common law or admiralty courts of the United States, where this defence has been held available. On the contrary, in the case of Bussy v. Donaldson, 4 Dall. [4 U. S.] 206, in the supreme court of Pennsylvania, when this defence was set up, it was not sustained, and Chief Justice Shippen, speaking in 1800, of the pilot law of Pennsylvania—an earlier law than the one now in force, but in this particular section the same as the present one—says, "The legislative regulations were not intended to alter or obliterate the principles of law, by

which the owner of a vessel was previously responsible for the conduct of a pilot; but to secure, in favour of every person (strangers as well as residents) trading to our ports, a class of experienced, skilful and honest mariners, to navigate their vessels safe up the bay and river Delaware. The mere right of choice, indeed, is one, but not the only, reason why the law in general makes the master liable for the acts of his servant: and in many cases, where the responsibility is allowed to exist, the servant may not in fact be the choice of the master. For instance, if the captain of a merchant vessel dies on the voyage, the mate becomes captain, and the owner is liable for his acts, though the owner did not hire him originally, or choose him to succeed the captain. The reason is plain: he is in the actual service of the owner, placed there, as it were, by the act of God. And so in the case under consideration, the pilot was in the actual service of the owner of the ship, though placed in that service by the provident act of the legislature."

The doctrine that the owners are not liable for a collision by their vessel when under the control of a licensed pilot, was first introduced in England by the pilot act of 52 Geo. III. c. 39, passed in 1812. Previous pilot laws, although they required every vessel to take on board such a pilot under penalties, did not discharge the owners from liability for their negligence. It appears by the case of Bowcher v. Noidstrom, 1 Taunt. 568, which was decided before Chief Justice Mansfield in 1809, that this notion that a licensed pilot was not considered a servant or agent of the owner, had obtained no place in courts of justice; for the chief justice held the master liable, on the assumption that he represented the ship or owners; and the case was reversed, not because his legal position was incorrect—to wit, that the ship or owners would have been liable for the act of either master or pilot, as their servant; but because one servant was not liable for the act of another, who was not his subordinate. The case of Fletcher v. Braddick, 2 Bos. & P. (N. R.) 182, though not directly in point, seems not to recognise the same principle. In cases of collision, the injured party has a remedy by action at common law, not only against the owners, but the master. And although the master of the vessel is the servant of the owners, and they are liable for his acts in the course of his employment, he is an exception to the general rule, that the remedy of third persons for the servant's acts of negligence is only against the master. As the pilot, when on board, has the absolute and exclusive control of the ship, the master might well defend himself against liability for the acts of one over whom he has no control or authority. Therefore by the maritime law the master is not held liable for the acts of mariners, who are not of his own choosing, and who are not acting under his orders. Moll. de J. Mar. bk. 2, c. 3, § 12. The pilot is for the time master of the vessel, and substituted in the place of the captain, with the same duties and responsibilities. But it is far from being so clear as a principle, either of maritime or common law, that the vessel or the owners are discharged from responsibility for the same reason.

Pilot laws are intended not to burthen commerce, but for its benefit and safety. As a general rule, masters of vessels are not expected to be, and cannot be, acquainted with the rocks and shoals on every coast, nor able to conduct a vessel safely into every port. Nor can the absent owners, or their agent, the master, be supposed capable of judging of the capacity of persons offering to serve as pilots. They need a servant, but are not in a situation to test or judge of his qualifications, and have not therefore the information necessary to choice. The pilot laws kindly interfere, and do that for the owners which they could not do for themselves. It selects persons of skill and experience, and requires them to give bonds for the faithful performance of their duties; and if it should happen in some particular cases, that owners may not need the services of such pilot selected by law, it is but just that they should contribute to the support of a system instituted for their benefit. This compulsion which is supposed to annul the relation of master and servant between pilot and owners, is more imaginary than real. It has its origin rather in minute verbal criticism of the language of the pilot laws, than on fact. The Pennsylvania pilot law, it is true, "obliges" a pilot to be taken on board, under the penalty of paying half pilotage. But, as has often been said, there is no magic in words. For after all, it amounts only to this: That vessels which do not find it necessary to avail themselves of the services of pilots provided for them by the law, may be piloted by the master or other person, if they prefer it; but in such case they will be required to pay a small tax, equal to half pilotage, for the benefit of the wives and children of those whose lives are daily exposed to peril and hardship, for the purpose of tendering their services, if needed. The assessment of a tax for the support of a system so beneficial to ship owners, where the services are declined is no compulsion, and calling it a penalty, will not alter the case. The vessel when under the control of a pilot, is in the legal possession of the owners. The pilot is their servant, acting in their employ, and receiving wages for services rendered to them. The fact that he was selected for them by persons more capable of judging of his qualifications, cannot alter the relation which he bears to the owners. He is still their servant.

The court of exchequer in the case of Attorney General v. Case, 3 Price, 302, confirm what I have said, that before the pilot act of 52 Geo. III. (1812), the owner was held liable

for the act of the pilot as his servant. They decided also, that the Liverpool pilot act was not compulsory or penal, though it required the vessel to pay the pilot's wages, whether it employed him or not. In the case before us the master may decline the services of the pilot, by paying half his wages. I am well aware that Dr. Lushington, in the case of The Maria, 1 W. Rob. Adm. 95, which arose on the Newcastle pilot act, has given a different construction to the Liverpool pilot act, because it uses the words "oblige and require."

The English cases on this subject, since 1812, cannot be reconciled with one another, and have not been adopted, as precedents here. On. the contrary. the case of Bussy v. Donaldson. in which I have quoted the opinion given by Chief Justice Shippen, has been adopted as founded on the sounder reasoning. See Yates v. Brown, 8 Pick. 23; Williamson v. Price, 4 Mart. (N. S.) 399; 3 Kent Comm. 175, 6. And in 1847, quite independently of that precedent, and without the least reference to it, the supreme court of Pennsylvania again interprets the statute before us in the same way as he did the one before him, in this respect. exactly like it. Flanigen v. Washington Ins. Co., 7 Pa. St. 312.

They say: "The legislature have wisely decided not to compel the owners to employ a licensed pilot, but have permitted them, if they please, to compound by paying half pilotage, for the benevolent and beneficial purpose of relieving distressed and decayed pilots, their widows and children. This act sets out an inducement to avail themselves of their services, but does not compel them to do so. This construction of the act is reasonable and just."

Thus far I have considered the question on the principles peculiar to the common or civil law relating to master and servant, rather than those of the maritime law. The proceeding in this case is in rem, for a maritime tort. The rights and remedies of the libellants are to be tested by the principles of that law, unaffected by any statutory provisions. A proceeding in rem, in admiralty, is not a mere attachment to compel the appearance of the owners, as in civil law proceedings, and attachments under the custom of London, which are not proceedings in rem in the admiralty sense of the phrase. The court of admiralty proceeds on the principle that the vessel itself is hypothecated by the contracts, as well as the obligations arising ex delicto of the master, and is herself liable for all maritime liens. The owners and others interested, are allowed to intervene pro interesse suo; and for convenience of trade and commerce, are permitted to release the vessel, by substituting their stipulation and security in its place. But the property attached is, in all cases, treated as the debtor, and primarily liable.

By the maritime law. the power of the master to bind the owners by his obligations ex delicto, did not extend beyond the tacit hypothecation of the property in his possession. By surrendering the hypothecated vessel, the owners escape further liability, or if they intervene, cannot be made liable beyond her value.

These principles which prescribe the powers of the master of a vessel, are not drawn from the doctrine of the civil law concerning the relation of master and servant, but had their origin in the maritime usages of the middle ages. By these the ship was bound to the merchandise and the merchandise to the ship; and both are bound for the mariners' wages. "even to the last nail of the ship." By these the master was authorized to bind the vessel by bottomry. And by these the vessel becomes hypothecated for the obligations of the master arising ex delicto, and is herself treated as the debtor or offender. Hence, also, the vessel became bound to those who dealt with the master, whether he was appointed to act as their agent, or the ship was let to him on charter-party. It is unnecessary to make an array of the various European writers on this subject, as authority for these statements. I refer for them to the opinions of Judge Ware, in the cases of Poland v. The Spartan [Case No. 11,246]; The Rebecca [Id. 11,619], and The Phebe [Id. 11,064]. in which the origin and principles of maritime law affecting the liability of vessels for the contracts of the master, are treated with the ability and research which distinguished that judge.

It would seem to follow from these principles, that third persons, who may be supposed to be ignorant of the owners, have a right to treat the vessel as primarily liable. ex delicto, for the acts of the owner, who has the legal possession and control of her movements. The pilot is the master for the time being—as such, also, he is legally in possession, acting for the owners and in their services. The law which hypothecates the vessel for negligent or wrongful acts of her commander. does not stop to inquire as to the mode of his appointment, or the motives or degree of consent which accompanied it.

It is in accordance with these principles that the case of The Neptune the Second, 1 Dod. 467. was decided by Sir W. Scott, in 1814, two years after the passage of the pilot act of 52 Geo. III.. already referred to. It is supposed by Dr. Lushington (1 W. Rob. Adm. 49), that the learned judge overlooked the provisions of that statute; but as a true statement of the maritime law unaffected by statute regulations, it has never been impugned. In that case the pilot was wholly in fault, and it was objected that the vessel and the owners were not liable for the damages occasioned by the collision. But Sir W. Scott asserted the law to be, "That the parties who suffer are entitled to have their remedy against the vessel that occasioned the damage, and are not under the necessity of looking to the pilot for compensation. It cannot

be maintained that the circumstance of having a pilot on board, and acting in conformity with his directions, can operate as a discharge of the responsibility of the owners."

I am authorised to say that the point of law now before us, has been decided by my Brother Wayne, in the district of South Carolina, in the same way as I now determine it. Judgment reversed.